# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAWAD PULLIN,<br><br>*Plaintiff,*<br><br>v.<br><br>CITY OF PHILADELPHIA;<br>PHILADELPHIA SHERIFF'S OFFICE;<br>ROCHELLE BILAL, individually and in her official capacity as Sheriff of the City and County of Philadelphia;<br>JOHN DOE DEPUTY SHERIFFS 1 and 2, individually; and<br>JOHN DOES 3–10, individually,<br><br>*Defendants.* | Civil Action No. 26-cv-08997<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Jawad Pullin ("Plaintiff" or "Mr. Pullin"), by and through his undersigned counsel, brings this action against Defendants City of Philadelphia (the "City"), the Philadelphia Sheriff's Office (the "Sheriff's Office"), Sheriff Rochelle Bilal ("Sheriff Bilal"), John Doe Deputy Sheriffs 1 and 2, and John Does 3–10 (collectively, "Defendants"), and avers as follows:

## INTRODUCTION

1. This civil-rights action arises from the arrest, handcuffing, public display, and hours-long detention of Plaintiff, a Pennsylvania legislative staffer, by deputies of the Philadelphia Sheriff's Office on September 17, 2026, at Philadelphia City Hall.

2. Plaintiff had attended the opening session of Philadelphia City Council's fall session to hold a seat near his employer, Pennsylvania State Senator Sharif Street, who was scheduled to testify. Plaintiff brought a gym bag containing a laptop, boxing gloves, sneakers, and a headphone cord. The bag passed through the security screening required of every visitor to the Council Chambers.

3. After the bag was moved from the seat where Plaintiff left it and later removed from the Council Chambers, a Sheriff's Office K-9 alerted on it, and City Hall was evacuated. When Plaintiff came forward on his own to ask whether the bag might be his and to explain that his bag contained nothing dangerous, Sheriff's deputies immediately handcuffed him behind his back and led him past members of the press. Deputies then questioned him and confirmed that the bag was his.

4. Philadelphia Police Department bomb technicians examined the bag and determined that it contained no explosive device or other dangerous item. The scene was cleared at approximately 12:13 p.m., and City Hall was declared safe by approximately 12:45 p.m.

5. Sheriff's deputies did not release Plaintiff. They kept him in a holding cell in the basement of the Criminal Justice Center and then transported him, in a Sheriff's Office van, to Philadelphia Police Headquarters, where he was searched, had the laces removed from his shoes, was placed in another cell to wait for an investigator, and was interviewed on video. He was not released until approximately 3:00 p.m.—more than two hours after the authorities knew the bag posed no threat.

6. Throughout, deputies indicated by their words and conduct that they did not think Plaintiff had done anything wrong, yet they continued to hold him. No one ever told Plaintiff why he was under arrest. He was never charged with any offense.

7. The arrest and detention were widely reported. At least one Philadelphia journalist identified Plaintiff by name as the person "detained and arrested" over the "suspicious backpack," multiple social-

media commentators named him as well, and video footage of his arrest was broadcast on FOX29 News. For a legislative director whose work depends on his standing in Philadelphia's political community, the harm to his reputation has been severe.

8. The Fourth Amendment does not permit law-enforcement officers to arrest a person without probable cause, or to continue holding a person in custody after any basis for suspicion has been dispelled. The conduct alleged here resulted from the policies, customs, and deliberately indifferent training and supervision practices of a Sheriff's Office whose staffing, training, and management failures have been the subject of repeated judicial orders, audits, and public calls for its abolition.

9. Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 and Pennsylvania law to recover damages for the violation of his rights.

## PARTIES

10. Plaintiff Jawad Pullin is an adult individual residing in Philadelphia, Pennsylvania. Plaintiff is employed as Legislative Director in the Office of Pennsylvania State Senator Sharif Street.

11. Before joining Senator Street's office, Plaintiff served as a Legislative Director with the Philadelphia City Council.

12. Defendant City of Philadelphia is a city of the first class and a municipal corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with offices at City Hall, 1400 John F. Kennedy Boulevard, Philadelphia, PA 19107. The City is sued directly for municipal liability under 42 U.S.C. § 1983.

13. Defendant Philadelphia Sheriff's Office is the law-enforcement office of the City and County of Philadelphia, headed by the elected Sheriff, with its principal office at Land Title Building, 100 South Broad Street, Fifth Floor, Philadelphia, PA 19110. The Sheriff's Office provides security at Philadelphia City Hall, including for meetings of City Council, and at the Criminal Justice Center. It also operates holding facilities at the Criminal Justice Center, transports persons in custody, and maintains a K-9 Unit.

14. Upon information and belief, the Sheriff's Office is funded through the City's operating budget, and its employees are paid by the City. To the extent the Sheriff's Office is determined to be a department or agency of the City rather than a separate legal entity capable of

being sued, Plaintiff's claims against the Sheriff's Office are asserted against the City, and all references herein to the Sheriff's Office identify the City agency through which the challenged conduct occurred. Plaintiff names the Sheriff's Office in the alternative to the extent it is a separate entity subject to suit.

15. Defendant Rochelle Bilal is the elected Sheriff of the City and County of Philadelphia and has held that office since January 2020. As Sheriff, she is the chief executive and final policymaker of the Sheriff's Office with respect to its law-enforcement, security, arrest, detention, transport, K-9, training, and supervision policies and practices. At all relevant times, Sheriff Bilal acted under color of state law. She is sued in her individual capacity and in her official capacity.

16. Defendants John Doe Deputy Sheriffs 1 and 2 ("Deputy Does 1 and 2") are deputy sheriffs employed by the Sheriff's Office who arrested and handcuffed Plaintiff in City Hall on September 17, 2026. At all relevant times, Deputy Does 1 and 2 acted under color of state law and within the course and scope of their employment with the Sheriff's Office and the City. They are sued in their individual capacities.

17. Defendants John Does 3–10 are presently unidentified deputy sheriffs, supervisors, commanders, and other officials and employees of the Sheriff's Office who escorted, transported, held, guarded, or processed Plaintiff on September 17, 2026; who directed, approved, or acquiesced in his arrest, continued detention, and transfer to the Philadelphia Police Department; or who were responsible for training and supervising the deputies involved. At all relevant times, John Does 3–10 acted under color of state law and within the course and scope of their employment with the Sheriff's Office and the City. They are sued in their individual capacities.

18. The identities of Deputy Does 1 and 2 and John Does 3–10 (collectively, the "Doe Defendants") are presently unknown to Plaintiff. Their identities are reflected in records within Defendants' possession, including duty rosters, post assignments, K-9 Unit records, vehicle and transport logs, holding-cell logs, incident reports, and video recordings. Plaintiff will seek leave to amend this Complaint to identify them by name when their identities are learned through discovery.

19. Each individual Defendant is sued for his or her own conduct, including personal participation, direction, and knowing acquiescence in the violations alleged herein.

## JURISDICTION AND VENUE

20. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

21. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

22. This Court has supplemental jurisdiction over Plaintiff's Pennsylvania state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this District and all of the events and omissions giving rise to Plaintiff's claims occurred in the City of Philadelphia, within the Eastern District of Pennsylvania.

## FACTUAL ALLEGATIONS

### A. Plaintiff Attends the Opening Session of City Council's Fall Session.

24. On Thursday, September 17, 2026, Philadelphia City Council convened for the first meeting of its fall session. The meeting was scheduled to begin at 10:00 a.m. in the Council Chambers, Room 400, of Philadelphia City Hall, 1400 John F. Kennedy Boulevard, Philadelphia, PA 19107.

25. Senator Street was scheduled to testify during the public portion of the session.

26. Plaintiff arrived at City Hall early to hold a seat in Room 400 near Senator Street. As a scheduled speaker, Senator Street would be seated in an area designated for special guests, and Plaintiff intended to sit directly behind him.

27. Because of his prior service as a Legislative Director with City Council, Plaintiff is familiar with City Hall, the Council's legislative process, and many of the officials and staff who work there, including the Council's Sergeant at Arms, John Fenton.

28. Plaintiff had come to City Hall from his home. Because his laptop bag was torn, Plaintiff carried his laptop in his gym bag, a black

Everlast backpack. The backpack contained the laptop, boxing gloves, sneakers, and a headphone cord.

29. The backpack did not contain any explosive, explosive component, firearm, ammunition, weapon, or other dangerous item.

30. City Council permits visitors to bring bags, including backpacks, into the Council Chambers. Visitors and their belongings must pass through a security check on the fourth floor before entering the Chambers. Council's published visitor guidance prohibits weapons and certain other items, but it contains no rule governing bags left on a seat or out of a visitor's hands while the visitor remains in or near the Chambers.

31. Before entering Room 400, Plaintiff and his backpack passed through the metal detector and security screening required of all visitors.

32. Upon information and belief, the security screening at the entrance to the Council Chambers is staffed or overseen by the Sheriff's Office.

**B. The Sheriff's Office Is Responsible for Security at City Hall and City Council.**

33. The Sheriff's Office provides security at Philadelphia City Hall, including during meetings of City Council.

34. Upon information and belief, Sheriff's deputies are assigned to the Council Chambers during Council sessions, are responsible for responding to security concerns in and around the Chambers, and maintain a K-9 Unit trained to detect the odor of explosives.

35. Upon information and belief, unattended or unclaimed bags, packages, and personal items are a recurring occurrence at City Hall, which is visited daily by large numbers of employees, elected officials, attorneys, litigants, members of the public, and visitors.

36. The Sheriff's Office, Sheriff Bilal, and the City therefore knew that Sheriff's deputies assigned to City Hall would regularly encounter unattended items, K-9 alerts, and the owners of those items, and would be required to make decisions about whether to detain or arrest those owners, how long any detention could lawfully last, and when a detained person must be released.

**C. Plaintiff's Bag Is Moved, Removed, and Examined, and City Hall Is Evacuated.**

37. When Plaintiff entered Room 400, he placed his backpack on a seat directly behind the area designated for special guests, to hold that seat while he waited for Senator Street, who was running late. Plaintiff then spoke with colleagues and acquaintances nearby.

38. When the session began, Plaintiff took a seat a few rows behind the seat where his backpack had been placed, within view of that seat.

39. At approximately 10:30 a.m., Plaintiff stepped out of Room 400 to call Senator Street, whose time to testify was approaching.

40. When Plaintiff returned to Room 400, he observed that his backpack had been moved from the seat to the floor beside it, and that another individual was now sitting in the seat.

41. Upon information and belief, after the backpack had been moved to the floor, an attendee noticed it and brought it to the attention of the Sergeant at Arms.

42. Because the session was in progress, Plaintiff did not want to disrupt the proceedings by retrieving the backpack. He returned to

his seat, from which the area where the backpack had been placed remained within his view.

43. Upon information and belief, at or about 11:07 a.m., and without Plaintiff's knowledge, the Sergeant at Arms removed the backpack from Room 400 and notified the Sheriff's Office.

44. According to the Philadelphia Police Department Complaint or Incident Report prepared that day, a Sheriff's Office K-9 handled by a deputy identified as "Deputy Lowery #597" alerted on the backpack, and a second Sheriff's Office K-9 handled by a deputy identified as "Deputy Cannoly #843" was called to the backpack and also alerted. Police radio then notified the Philadelphia Police Department Bomb Squad. A true and correct copy of the Philadelphia Police Department Complaint or Incident Report is attached hereto as Exhibit A.

45. A canine alert indicates, at most, that the dog has detected an odor associated with substances the dog has been trained to recognize. An alert does not establish that an item contains an explosive device, and it does not establish that the owner of the item has committed, is committing, or is about to commit any crime.

46. Common, lawful activities, such as visiting a firing range or handling fireworks, can leave residue on a bag that may cause a canine to alert. Philadelphia Police Deputy Commissioner Frank Vanore publicly acknowledged as much on September 17, 2026, stating that residue from a firearm, a gun range, or fireworks could have caused the dogs to alert on Plaintiff's backpack, and that it was possible nothing nefarious had occurred.

47. At approximately 11:30 a.m., an announcement was made directing everyone to evacuate City Hall. All seventeen members of City Council, their staffs, journalists, and members of the public were evacuated from the building.

**D. Plaintiff Comes Forward to Ask About the Bag and Is Immediately Arrested.**

48. When the evacuation was announced, Plaintiff went to retrieve his backpack before leaving the Chambers. The backpack was not where he had last seen it.

49. While Plaintiff was looking for his backpack, a woman asked him what he was looking for. Plaintiff told her that he was looking for his bag. The woman told Plaintiff that the evacuation was the result of a bomb threat involving an unattended bag.

50. Plaintiff then saw the Sergeant at Arms, whom he knew, and voluntarily approached him to ask for a description of the bag that had been removed, so that Plaintiff could determine whether it was his and, if so, explain that it contained nothing dangerous.

51. During that conversation, Plaintiff indicated that the bag might be his, although it had not been confirmed that it was his bag. Plaintiff advised that his bag did not contain any explosive, explosive component, firearm, or other dangerous item.

52. Plaintiff did not attempt to flee, conceal his identity, or avoid the authorities. He sought them out.

53. Immediately after Plaintiff indicated that the bag might be his, two Sheriff's deputies, Deputy Does 1 and 2, seized Plaintiff, placed him under arrest, and handcuffed his hands behind his back.

54. Deputy Does 1 and 2 did not have a warrant for Plaintiff's arrest.

55. Deputy Does 1 and 2 did not have probable cause to believe that Plaintiff had committed, was committing, or was about to commit any offense.

56. At the time of the arrest, the only information known to Deputy Does 1 and 2 was that a backpack that had passed through security screening had been left in the Chambers, that a canine had alerted on it, and that a person who might be its owner—a known former City Council staffer working for a sitting State Senator—had voluntarily come forward to ask about it and to state that his bag contained nothing dangerous.

57. At the direction of Deputy Does 1 and 2, Plaintiff removed his belongings, including his phone and his watch, from his pockets. Plaintiff was permitted to hold on to those items until he was taken to the Criminal Justice Center.

58. Throughout the arrest, Plaintiff repeatedly told the deputies that there was nothing harmful in his bag. Plaintiff cooperated fully and did not resist.

59. No deputy told Plaintiff why he was being arrested. No deputy advised Plaintiff of any charge or suspected offense.

60. While Plaintiff was in their custody, Sheriff's deputies remarked among themselves, in Plaintiff's presence, "yea we gotta take

this guy, not sure what this is all about, doesn't seem like he did anything," or words to that effect.

61. Notwithstanding those statements, no deputy released him, and no deputy intervened to stop the arrest and detention.

**E. Deputies Lead Plaintiff, in Handcuffs, Past the Press.**

62. After the arrest, Sheriff's deputies escorted Plaintiff, handcuffed, through City Hall to the south side of the building.

63. The route the deputies chose took Plaintiff past multiple journalists and members of the media who were covering the Council session and the evacuation, including Philadelphia Inquirer reporter Sean Collins Walsh. Members of the media photographed and video-recorded Plaintiff in handcuffs and attempted to interview him.

64. The Philadelphia Inquirer reported that day that, "[a]s chambers were being evacuated, officers detained and removed a government employee," and that "[t]he employee spoke to a reporter while in handcuffs." Sean Collins Walsh & Anna Orso, *Philly City Hall Was Evacuated for a Bomb Squad Investigation, but No Explosive Device Was Found*, Phila. Inquirer (Sept. 17, 2026),

https://www.inquirer.com/politics/philadelphia/city-council-evacuated-bomb-squad-20260917.html.

65. Upon information and belief, the deputies made no effort to shield Plaintiff from the media or to avoid parading him, in handcuffs, before reporters and photographers, although alternative routes and other means of avoiding that exposure were available to them.

66. The deputies placed Plaintiff in a chair in a hallway on the south side of City Hall, where he remained in handcuffs for approximately ten minutes.

67. While Plaintiff was held on the fourth floor of City Hall, deputies questioned him about the backpack. During that questioning, it was confirmed that the backpack was Plaintiff's.

68. Deputies then escorted Plaintiff downstairs and placed him in the back of a Sheriff's Office van.

**F. Plaintiff Remains Jailed at the Criminal Justice Center After the Bag Is Cleared.**

69. Sheriff's deputies transported Plaintiff in the van from City Hall to the Criminal Justice Center ("CJC"), 1301 Filbert Street, Philadelphia, PA 19107.

70. At the CJC, Sheriff's deputies placed Plaintiff in a holding cell in the basement, a facility operated by the Sheriff's Office.

71. There, deputies removed Plaintiff's handcuffs and then handcuffed him again with his hands in front of his body. Deputies also took Plaintiff's phone and watch, which he had been permitted to keep until that point.

72. Plaintiff remained in the CJC holding cell, in Sheriff's Office custody, for approximately one hour.

73. Meanwhile, Philadelphia Police Department officers and the Bomb Squad examined the backpack, including by X-ray, and determined that it contained no explosive device.

74. As publicly reported, police cleared the scene at approximately 12:13 p.m., after examining the package and determining that it did not contain a device.

75. According to the Philadelphia Police Department Complaint or Incident Report, the package and building were cleared at approximately 12:45 p.m. *See* Ex. A. Evacuees were permitted to reenter City Hall shortly before 1:00 p.m., and City Council reconvened shortly thereafter.

76. News reports stated that the backpack contained a laptop, boxing gloves, shoes, and a jump rope (in fact, a headphone cord)—a gym bag containing nothing dangerous, as Plaintiff had said.

77. Upon information and belief, by no later than approximately 12:45 p.m., the Sheriff's Office, including the Doe Defendants responsible for Plaintiff's custody, knew or had been informed that the backpack contained no explosive device or other dangerous item.

78. Any suspicion that might have justified briefly detaining Plaintiff while the backpack was examined was dispelled no later than that time.

79. Sheriff's deputies nonetheless kept Plaintiff locked in the CJC holding cell.

80. While Plaintiff was held at the CJC, deputies stated that it did not seem that he had done anything wrong, and that they therefore did not think it necessary to hold him as long as they had held another person. Deputies also told Plaintiff that, after he was taken to the Philadelphia Police Department, he would probably be let go.

81. No deputy released Plaintiff, and no deputy told Plaintiff the basis for his continued detention.

## G. Sheriff's Deputies Transfer Plaintiff to Police Headquarters, Where His Detention Continues.

82. After Plaintiff had been held in the CJC holding cell for approximately one hour, a Sheriff's deputy told Plaintiff that "Central District wants to talk to you," or words to that effect.

83. Rather than release Plaintiff, Sheriff's deputies placed him in the back of another Sheriff's Office van and transported him, in custody, to Philadelphia Police Department Headquarters at 400 North Broad Street, Philadelphia, PA 19130.

84. Plaintiff did not consent to being transported to Police Headquarters for questioning. He was taken there as a detainee in Sheriff's Office custody.

85. Upon information and belief, the decisions to continue holding Plaintiff after the backpack had been cleared, and to deliver him in custody to the Philadelphia Police Department for questioning rather than release him, were made, directed, or approved by Sheriff's Office personnel, including one or more of John Does 3–10.

86. Upon arrival at Police Headquarters, Plaintiff was ordered to place his hands against a wall and spread his legs while an officer searched him. The officer removed the laces from Plaintiff's shoes.

87. Plaintiff was subjected to medical screening, including measurement of his vital signs and temperature, and was required to complete medical intake forms.

88. Plaintiff was then placed in another holding cell, where he was left to wait for an investigator.

89. When a Philadelphia Police Department investigator eventually came to the cell, he opened it, apologized to Plaintiff, and acknowledged in substance that there had been an overreaction and that Plaintiff had done nothing wrong.

90. The investigator then took Plaintiff upstairs and conducted a video-recorded interview of him.

91. At no point during his detention was Plaintiff advised of the reason for his arrest or of any offense he was suspected of committing.

92. Plaintiff was released from Police Headquarters at approximately 3:00 p.m.

93. In total, Plaintiff was held in custody for approximately three and one-half hours, of which more than two hours followed the determination that his backpack contained no explosive device and posed no threat.

94. The continued detention of Plaintiff at Police Headquarters was the direct, foreseeable, and intended result of the Sheriff's Office's decision to keep Plaintiff in custody after the backpack had been cleared and to deliver him to the Police Department as a detainee.

## H. Plaintiff Is Never Charged.

95. Plaintiff was never charged with any crime or offense arising from the events of September 17, 2026.

96. On September 17, 2026, Deputy Commissioner Vanore publicly confirmed that no one had been charged in connection with the incident.

97. Plaintiff's backpack was a gym bag. He did nothing unlawful.

## I. The Arrest Is Widely Publicized, and Plaintiff Is Identified by Name.

98. Plaintiff's arrest and the City Hall evacuation were reported by every major Philadelphia news outlet, including The Philadelphia Inquirer, NBC10 Philadelphia, 6abc Philadelphia, and FOX29 Philadelphia.

99. Video footage of Plaintiff's arrest was broadcast on FOX29 News. Upon information and belief, other photographs and video

recordings of Plaintiff in Sheriff's Office custody were captured by members of the media and disseminated through news broadcasts, websites, and social media.

100. On September 18, 2026, Philadelphia journalist Ernest Owens published a widely circulated Instagram post stating that "authorities detained and arrested former City Council staffer Jawad Pullin, who they identified as the owner of the suspicious backpack in question," and identifying Plaintiff's current employment with Senator Street.

101. Multiple social-media personalities who comment on Philadelphia public affairs also identified Plaintiff by name in connection with the incident.

102. As a legislative director deeply involved in Philadelphia and Pennsylvania government and politics, Plaintiff depends on his reputation, credibility, and relationships with elected officials, staff, advocates, and members of the public.

103. Because of Defendants' conduct, Plaintiff has been publicly associated with a bomb scare that shut down City Hall and the opening

session of City Council, and his reputation has been seriously and lastingly harmed.

**J. The Sheriff's Office's Documented History of Institutional Failure.**

104. The events of September 17, 2026 did not occur in isolation. They occurred within a Sheriff's Office whose staffing, training, supervision, and management failures have been documented repeatedly by the courts, the City's own fiscal watchdogs, and Sheriff Bilal herself.

105. On December 9, 2024, the Administrative Governing Board of the First Judicial District of Pennsylvania (the "Administrative Governing Board" or the "Board"), the panel of judges that oversees the administration of the Philadelphia courts, issued an administrative order finding that the administration of justice in those courts "has been – and will continue to be – threatened due to the Philadelphia Sheriff Office's systemic failures to properly staff courtrooms and court facilities," and that "such security failures are an imminent threat to the safety and health of all persons present in the courthouses, courtrooms and court facilities." *In re: Directives to the Sheriff of Philadelphia Regarding Security of Court Facilities of the First Judicial*

*District*, Admin. Order No. 16 of 2024 (Phila. Admin. Governing Bd. Dec. 9, 2024).

106. The Administrative Governing Board further found that court security incidents had increased 140 percent between 2022 and 2023, and that the Sheriff had "failed in her responsibility to timely transport incarcerated persons between the holding rooms and courtrooms" in the Criminal Justice Center. The Board also found that it had attempted to resolve these failures through "numerous informal and formal meetings, discussions and communications" with Sheriff Bilal and her leadership, "to no avail." *Id.* The Board ordered Sheriff Bilal to deliver, within thirty days, a written plan to accomplish its directives within ninety days, including plans to provide security patrols throughout City Hall and to place a deputy sheriff on "[e]ach floor of City Hall from the 2nd Floor to 6th Floor." *Id.*

107. On March 11, 2025, the Administrative Governing Board issued a second order finding that the ninety-day deadline had expired, that "some of the directives have not been accomplished," and that the Sheriff "currently does not have enough deputies to accomplish all the directives." *In re: Additional Directives to the Sheriff of Philadelphia*

*Regarding Security of Court Facilities of the First Judicial District*, Admin. Order No. 3 of 2025 (Phila. Admin. Governing Bd. Mar. 11, 2025). The Board ordered Sheriff Bilal to report on her efforts to fill budgeted deputy positions, including the creation of a Sheriff Academy in Philadelphia. *Id.*

108. On March 18, 2025, the Pennsylvania Intergovernmental Cooperation Authority ("PICA") recommended that City Council and the Mayor "take steps to eliminate the offices of the Sheriff and the Register of Wills as independently elected offices." PICA Res. No. 2025-11 (Mar. 18, 2025). PICA found that the Sheriff's Office "continues to this day its practice of resisting attempts at accountability by the City Controller, this Authority, and other entities tasked with oversight over the City government," and cited the "ongoing and serious operational and financial mismanagement of the Sheriff's office." *Id.*

109. As publicly reported, on April 28, 2026, Sheriff Bilal testified before City Council that the Sheriff's Office suffered from chronic staffing and deputy shortages and requested a budget increase of approximately 54 percent, in part to open a local training academy and to expand the Sheriff's Office's K-9 Unit.

110. On September 20, 2023, the Office of the City Controller informed Sheriff Bilal that 76 Sheriff's Office service firearms and 109 weapons surrendered under Protection From Abuse orders remained unaccounted for because the Sheriff's Office lacked sufficient documentation of their whereabouts or disposition. Office of the City Controller, *Philadelphia Sheriff's Office: Follow-Up Review of Missing Guns* (Aug. 2023) (transmitted Sept. 20, 2023).

111. On May 12, 2022, the City Controller issued an audit of the Sheriff's Office, covering a period that included Sheriff Bilal's first year in office, that found "internal control and compliance deficiencies, many of which were significant," and a "lack of formal written policies and procedures." Office of the City Controller, *Performance Audit of the Philadelphia Sheriff's Office Custodial Accounts* (May 12, 2022).

112. As publicly reported, the City has paid more than $1 million to settle whistleblower lawsuits brought by former senior Sheriff's Office employees.

113. As publicly reported, in March 2022, Sheriff's deputies executing a bench warrant entered a Philadelphia home in tactical gear with guns drawn in search of a man who had been killed months

earlier, and a Sheriff's Office spokesperson stated afterward that no mechanism existed to check in advance whether the subject of a warrant had died.

114. On May 13, 2026, the Court of Common Pleas of Philadelphia County issued an Order and Rule to Show Cause stating that it appeared that "the Philadelphia County Sheriff's Office is not timely performing its essential, non-discretionary, ministerial duties, which are mandated by law, with respect to Sheriff's Sales of real property," and directing the Sheriff to show cause why the court should not enforce a February 24, 2003 Consent Order of Mandamus and require the Sheriff to promptly perform those duties. *JSB Prop. Grp., LLC v. City of Philadelphia*, March Term, 2026, No. 02653 (C.P. Phila. May 13, 2026) (Order and Rule to Show Cause).

115. The court further directed the Sheriff to show cause why a special master or similar person "shall not be appointed by the Court to oversee the Sheriff's Office's performance of its duties," including by "establishing procedures, deadlines, reporting requirements, accounting controls, staffing recommendations, and operational safeguards." *Id.* ¶ 2.

116. These public findings and proceedings placed Sheriff Bilal and the City on notice, well before September 17, 2026, that the Sheriff's Office suffered from serious and persistent deficiencies in staffing, training, supervision, internal controls, and management, and that those deficiencies extended to the Sheriff's Office's core law-enforcement functions, including security, the handling of detainees, and the operation of holding facilities.

117. Upon information and belief, notwithstanding that notice, Sheriff Bilal and the City failed to take adequate steps to ensure that Sheriff's deputies assigned to City Hall were trained and supervised regarding the constitutional limits on arrests and detentions, including in the recurring circumstance of unattended items and K-9 alerts.

**K. Municipal Policy, Custom, Practice, and Deliberate Indifference.**

118. The seizure and continued detention of Plaintiff were not the isolated act of a single deputy.

119. They involved multiple deputies, at multiple locations, over several hours, including the deputies who arrested and handcuffed Plaintiff in City Hall, the deputies who escorted him through City Hall, the deputies who transported him to the CJC, the deputies who held

him in the CJC holding cell, the deputies who transported him to Police Headquarters, and the personnel who directed or approved those actions.

120. Multiple deputies indicated, in Plaintiff's presence, that he did not appear to have done anything wrong, yet none released him or took any step to end his detention. That uniform response reflects the deputies' understanding that the Sheriff's Office's established practice was to keep Plaintiff in custody regardless of whether probable cause existed.

121. Upon information and belief, the Sheriff's Office maintains a policy, custom, or practice, in incidents involving suspicious or unattended items at City Hall, of (a) arresting and handcuffing the owner of any item on which a K-9 alerts, without an individualized determination of probable cause; (b) holding that person in custody until another agency "clears" him or her, without regard to whether the item itself has been cleared and any basis for suspicion has been dispelled; and (c) delivering that person in custody to the Philadelphia Police Department for questioning rather than releasing him or her.

122. Upon information and belief, the Sheriff's Office has failed to adopt, implement, or enforce adequate policies governing the circumstances in which deputies may arrest or detain persons, the permissible scope and duration of investigative detentions, the significance of K-9 alerts, the obligation to release detainees once probable cause or reasonable suspicion has dissipated, the transfer of detainees to other agencies, and the avoidance of unnecessary public display of detainees.

123. Upon information and belief, the Sheriff's Office has failed to train its deputies adequately on those subjects.

124. The need for such training was obvious. Sheriff's deputies assigned to City Hall predictably and regularly confront unattended items, K-9 alerts, and the owners of those items. Without adequate training, it was highly predictable that deputies would arrest persons without probable cause and hold them after any basis for suspicion had been dispelled, in violation of the Fourth Amendment.

125. Upon information and belief, the Sheriff's Office has also failed to supervise adequately its deputies' arrest, detention, and

transport decisions, including by failing to require supervisory review of the continued detention of persons in its custody.

126. Sheriff Bilal is the final policymaker for the Sheriff's Office with respect to its law-enforcement, security, arrest, detention, transport, K-9, training, and supervision policies.

127. Upon information and belief, Sheriff Bilal established, maintained, or approved the policies, customs, and practices described above, and failed to adopt policies and training adequate to prevent the constitutional violations alleged herein, with deliberate indifference to the known and obvious risk that those deficiencies would result in unlawful arrests and detentions.

128. Upon information and belief, Sheriff's Office supervisory and command personnel with authority over City Hall security, the K-9 Unit, the CJC holding facilities, and detainee transport knew of, directed, approved, or acquiesced in Plaintiff's arrest, continued detention, and transfer to the Police Department.

129. Upon information and belief, following the events of September 17, 2026, which were widely publicized, Sheriff Bilal and the Sheriff's Office did not discipline any deputy, did not investigate the

lawfulness of Plaintiff's arrest and detention, and did not revise any policy or training, thereby approving and ratifying the conduct and its basis.

130. Plaintiff presently lacks access to the Sheriff's Office's written directives, post orders, K-9 Unit procedures, training materials, supervisory communications, incident reports, disciplinary records, and records of prior similar incidents. That information is principally within Defendants' possession and control and will be the subject of discovery.

131. The policies, customs, practices, and deliberately indifferent failures to train and supervise described above were the moving force behind the violations of Plaintiff's constitutional rights.

**L. Harm to Plaintiff.**

132. As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of his liberty for approximately three and one-half hours, including more than two hours after the authorities knew his backpack posed no threat.

133. Plaintiff was handcuffed, displayed in handcuffs before the press, placed in the back of two Sheriff's Office vans, locked in two

holding cells, stripped of his phone, watch, and shoelaces, searched, subjected to medical intake, and interviewed on video.

134. Plaintiff missed the remainder of the City Council session, at which he was present in his professional capacity on behalf of Senator Street.

135. Plaintiff missed a work event that afternoon with Senator Street and representatives of Comcast and the Philadelphia 76ers.

136. Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, anxiety, emotional distress, and fear arising from his arrest, detention, and public identification as the person at the center of a bomb scare.

137. Plaintiff has suffered serious and lasting harm to his personal and professional reputation, standing, and relationships.

138. Plaintiff has incurred, and will continue to incur, attorneys' fees and costs in seeking redress for the violation of his rights.

**COUNT I**
**<u>42 U.S.C. § 1983 – Fourth Amendment</u>**
**<u>Unlawful Seizure, False Arrest, and Unlawful Search</u>**
**(Plaintiff v. Defendants Deputy Does 1 and 2 and John Does 3–10)**

139. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

140. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees the right of the people to be secure in their persons against unreasonable searches and seizures.

141. An arrest is a seizure that is reasonable under the Fourth Amendment only if it is supported by probable cause to believe that the person arrested has committed or is committing an offense. A seizure that exceeds the scope of a brief investigative stop—including by handcuffing a person, transporting him from the scene, and placing him in a cell—is a de facto arrest that requires probable cause.

142. Deputy Does 1 and 2 seized and arrested Plaintiff when they handcuffed him behind his back in City Hall and took him into custody.

143. Deputy Does 1 and 2 lacked probable cause to arrest Plaintiff. A canine alert on a gym bag that had passed through security screening, about which Plaintiff, a known former City Council staffer,

voluntarily inquired while explaining that his bag contained nothing dangerous, did not establish a fair probability that Plaintiff had committed, was committing, or was about to commit any offense.

144. No reasonable officer could have believed that probable cause existed to arrest Plaintiff on those facts.

145. Alternatively, to the extent Deputy Does 1 and 2 had reasonable suspicion permitting a brief investigative detention while the backpack was examined, they exceeded the permissible scope of such a detention by handcuffing Plaintiff, leading him through City Hall, and transporting him to and confining him in a holding cell at another location, without probable cause.

146. Deputy Does 1 and 2 required Plaintiff to empty his pockets, and John Does 3–10 seized his phone, watch, and other belongings at the CJC. Because Plaintiff's arrest was unlawful, that search and seizure were not a lawful search incident to arrest, and they were not otherwise supported by a warrant, probable cause, or any exception to the warrant requirement.

147. Deputy Does 1 and 2 and John Does 3–10 also effected the seizure in an unreasonable manner by leading Plaintiff, handcuffed,

past members of the press, and by subjecting him to public display that served no legitimate law-enforcement purpose.

148. John Does 3–10 personally participated in, directed, approved, or knowingly acquiesced in the unlawful arrest, search, and seizure of Plaintiff.

149. Defendants acted intentionally, willfully, and with reckless and callous indifference to Plaintiff's clearly established constitutional rights.

150. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the injuries and damages described herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants Deputy Does 1 and 2 and John Does 3–10 on Count I; compensatory damages; nominal damages; punitive damages; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other relief as the Court deems just and appropriate.

**COUNT II**
**42 U.S.C. § 1983 – Fourth Amendment**
**False Imprisonment and Unreasonably Prolonged Detention**
**(Plaintiff v. Defendants Deputy Does 1 and 2 and John Does 3–10)**

151. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

152. A person who is arrested without probable cause is falsely imprisoned in violation of the Fourth Amendment for the duration of the resulting detention.

153. Independently, even where a seizure is lawful at its inception, the Fourth Amendment forbids continuing to hold a person in custody after the facts that justified the seizure have been dispelled. An investigative detention must be temporary, last no longer than necessary to effectuate its purpose, and end once the officers' suspicion is resolved. Transporting a person to a police facility for interrogation without probable cause is an unreasonable seizure.

154. Plaintiff was held in the custody of Defendants from his arrest in City Hall at approximately 11:30 a.m. until his release at approximately 3:00 p.m.

155. Because Plaintiff was arrested without probable cause, his entire detention was a false imprisonment in violation of the Fourth Amendment.

156. In the alternative, no later than approximately 12:45 p.m., the backpack had been examined and cleared, City Hall had been declared safe, and any suspicion that might have justified detaining Plaintiff had been dispelled. From that point forward, Defendants had no lawful basis to hold Plaintiff.

157. Defendants nonetheless continued to confine Plaintiff in the CJC holding cell and then transported him, in custody, to Philadelphia Police Headquarters for questioning, where his confinement continued until approximately 3:00 p.m.

158. Defendants knew, or recklessly disregarded, that the backpack had been cleared and that there was no basis to continue holding Plaintiff, as reflected in deputies' statements that Plaintiff did not appear to have done anything wrong and would probably be let go.

159. Defendants' decision to deliver Plaintiff in custody to the Philadelphia Police Department set in motion, and was a proximate cause of, Plaintiff's continued detention at Police Headquarters. That

continued detention was the foreseeable and intended result of Defendants' conduct.

160. No reasonable officer could have believed it lawful to continue to hold Plaintiff in custody, and to transport him to a police facility for questioning, after the backpack had been cleared and any basis for suspicion had been dispelled.

161. Defendants acted intentionally, willfully, and with reckless and callous indifference to Plaintiff's clearly established constitutional rights.

162. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the injuries and damages described herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants Deputy Does 1 and 2 and John Does 3–10 on Count II; compensatory damages; nominal damages; punitive damages; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other relief as the Court deems just and appropriate.

**COUNT III**
**<u>42 U.S.C. § 1983 – Fourteenth Amendment Due Process</u>**
**<u>(Pleaded in the Alternative to Counts I and II)</u>**
**(Plaintiff v. Defendants Deputy Does 1 and 2 and John Does 3–10)**

163. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

164. Plaintiff pleads this Count in the alternative to Counts I and II, to the extent any portion of Plaintiff's detention, or the manner of his treatment, is determined to fall outside the protections of the Fourth Amendment.

165. The Due Process Clause of the Fourteenth Amendment prohibits the States from depriving any person of liberty without due process of law, and protects against arbitrary governmental action that shocks the conscience.

166. Plaintiff possessed a fundamental liberty interest in freedom from physical restraint and confinement.

167. Defendants deprived Plaintiff of that interest by continuing to confine him after they knew, or had been informed, that the backpack had been cleared and that Plaintiff had committed no offense, while

acknowledging, in Plaintiff's presence, that he did not appear to have done anything wrong.

168. Defendants provided Plaintiff no process of any kind. They did not inform him of the reason for his arrest or detention, did not bring him before any judicial officer, and did not afford him any opportunity to contest his confinement, while continuing to hold him in two successive holding cells and transferring him between facilities.

169. Defendants further deprived Plaintiff of liberty in a manner that publicly stigmatized him, by leading him, handcuffed, past members of the press and thereby publicly branding him as the suspect in a bomb threat at City Hall, a characterization Defendants knew or should have known was false, in conjunction with the deprivation of his physical liberty.

170. Continuing to confine a person whom officers know to be innocent of any wrongdoing, for no legitimate purpose, is arbitrary, unjustifiable, and conscience-shocking.

171. Defendants acted intentionally, willfully, and with deliberate indifference to Plaintiff's clearly established constitutional rights.

172. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the injuries and damages described herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants Deputy Does 1 and 2 and John Does 3–10 on Count III; compensatory damages; nominal damages; punitive damages; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other relief as the Court deems just and appropriate.

## COUNT IV
## 42 U.S.C. § 1983 – Failure to Intervene
## (Plaintiff v. Defendants Deputy Does 1 and 2 and John Does 3–10)

173. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

174. A law-enforcement officer who is present when another officer violates a person's constitutional rights, who knows or has reason to know of the violation, and who has a realistic and reasonable opportunity to intervene, is liable under 42 U.S.C. § 1983 for failing to take reasonable steps to prevent or stop the violation.

175. Each of the Doe Defendants was present for, or responsible for, some portion of Plaintiff's arrest, handcuffing, search, escort, transport, and detention.

176. Each of the Doe Defendants knew or had reason to know that Plaintiff had been arrested without probable cause and that his continued detention was unlawful, as reflected in deputies' statements that Plaintiff did not appear to have done anything wrong.

177. Over a period of several hours and at multiple locations, each of the Doe Defendants had a realistic and reasonable opportunity to intervene, including by removing Plaintiff's handcuffs, releasing him, notifying a supervisor that the backpack had been cleared, or declining to transport him to Police Headquarters.

178. None of the Doe Defendants took any step to prevent or end the violation of Plaintiff's rights.

179. As a direct and proximate result of Defendants' failure to intervene, Plaintiff suffered the injuries and damages described herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants Deputy Does 1 and 2 and John Does 3–10 on Count IV; compensatory damages; nominal damages; punitive damages;

reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other relief as the Court deems just and appropriate.

**COUNT V**
**42 U.S.C. § 1983 – Supervisory Liability**
**(Plaintiff v. Defendant Sheriff Rochelle Bilal, Individually, and John Does 3–10)**

180. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

181. A supervisor may be held individually liable under 42 U.S.C. § 1983 where, with deliberate indifference to the consequences, she established and maintained a policy, practice, or custom that directly caused the constitutional harm, or where she participated in violating the plaintiff's rights, directed others to violate them, or had knowledge of and acquiesced in her subordinates' violations.

**Policymaker Liability**

182. As Sheriff, Sheriff Bilal is responsible for establishing and maintaining the Sheriff's Office's policies, practices, and customs governing arrests, detentions, City Hall security, K-9 deployments, the

operation of holding facilities, the transport of detainees, and the training and supervision of deputies.

183. Sheriff Bilal established and maintained the policies, practices, and customs described in Paragraphs 118 through 131 above, and failed to adopt policies, training, and supervision adequate to prevent unlawful arrests and detentions.

184. Sheriff Bilal did so with deliberate indifference. By September 17, 2026, she had been ordered twice by the Administrative Governing Board to remedy systemic staffing and security failures, including at City Hall. Her office had been the subject of a public recommendation that it be abolished. She had acknowledged to City Council chronic staffing shortages and the absence of a local training academy. She had also been publicly confronted with an armed entry by her deputies into a home in search of a warrant subject who had been dead for months. She nonetheless failed to ensure that deputies assigned to City Hall were adequately trained and supervised regarding the constitutional limits on arrest and detention.

185. The deficiencies Sheriff Bilal maintained created an unreasonable risk of the precise constitutional injury Plaintiff suffered, and that risk was known or obvious to her.

**Personal Direction, Knowledge, and Acquiescence**

186. The September 17, 2026 evacuation of City Hall, which shut down the opening session of City Council, was a high-profile event involving the Sheriff's Office's security operation, its K-9 Unit, and its custody of the person identified as the owner of the backpack.

187. Upon information and belief, Sheriff Bilal and/or John Does 3–10, as Sheriff's Office supervisors and commanders, were informed of Plaintiff's arrest and custody while it was ongoing, knew or were informed that the backpack had been cleared, and directed, approved, or knowingly acquiesced in Plaintiff's continued detention and his transfer in custody to the Philadelphia Police Department.

188. Upon information and belief, Sheriff Bilal has not disciplined any deputy, investigated the lawfulness of Plaintiff's arrest and detention, or revised any policy or training in response to the events of September 17, 2026, notwithstanding their wide publicity.

189. The precise extent of Sheriff Bilal's and the supervisory Doe Defendants' knowledge and involvement is principally within Defendants' possession and control and will be the subject of discovery.

190. As a direct and proximate result of the conduct of Sheriff Bilal and John Does 3–10, Plaintiff suffered the injuries and damages described herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendant Sheriff Rochelle Bilal, individually, and John Does 3–10 on Count V; compensatory damages; nominal damages; punitive damages; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other relief as the Court deems just and appropriate.

## COUNT VI
## 42 U.S.C. § 1983 – Municipal Liability Under *Monell*
## (Plaintiff v. Defendants City of Philadelphia, Philadelphia Sheriff's Office, and Sheriff Rochelle Bilal, in Her Official Capacity)

191. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

192. Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a municipality is liable under 42 U.S.C.

§ 1983 when a constitutional violation is caused by an official policy, by a custom so persistent and widespread as to have the force of law, by the decision of an official with final policymaking authority, or by a deliberately indifferent failure to train or supervise. *See City of Canton v. Harris*, 489 U.S. 378 (1989).

193. As alleged in Counts I through IV, Plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments.

194. Plaintiff alleges several alternative and overlapping bases for municipal liability: (a) the Sheriff's Office's policy, custom, or practice of arresting and holding the owners of items on which a K-9 alerts until another agency "clears" them, and of delivering such persons in custody to the Philadelphia Police Department for questioning, without regard to probable cause or the dissipation of suspicion; (b) the deliberately indifferent failure to train deputies regarding probable cause, the scope and duration of investigative detentions, the significance of K-9 alerts, the obligation to release detainees, the transfer of detainees, and the avoidance of unnecessary public display of detainees; (c) the deliberately indifferent failure to supervise deputies' arrest, detention, and transport decisions; and (d)

the decisions, approval, and ratification of an official with final policymaking authority.

**Policy, Custom, and Practice**

195. The arrest and continued detention of Plaintiff were carried out by multiple deputies, at multiple locations, over several hours, without any deputy questioning the basis for Plaintiff's detention despite their acknowledgment that Plaintiff did not appear to have done anything wrong. Upon information and belief, the deputies acted in accordance with the established policies, customs, and practices of the Sheriff's Office described above.

**Failure to Train and Supervise**

196. The City and the Sheriff's Office knew to a moral certainty that deputies assigned to City Hall would confront unattended items, K-9 alerts, and the owners of those items, and would be required to decide whether to arrest or detain those owners and when to release them.

197. Those decisions present difficult choices of the sort that training and supervision make less difficult, and the wrong choice will frequently cause the deprivation of a citizen's Fourth Amendment rights.

198. The City and the Sheriff's Office failed to provide adequate training and supervision on those subjects, notwithstanding repeated judicial orders, public findings, and Sheriff Bilal's own acknowledgments regarding the Sheriff's Office's staffing and training deficiencies.

199. The need for more or different training and supervision was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City's and the Sheriff's Office's policymakers were deliberately indifferent to that need.

**Final Policymaker Decision and Ratification**

200. Sheriff Bilal is the official with final policymaking authority for the City with respect to the Sheriff's Office's law-enforcement, security, arrest, detention, transport, K-9, training, and supervision policies.

201. To the extent Sheriff Bilal, or an official to whom she delegated final policymaking authority, directed or approved Plaintiff's continued detention and transfer, that decision constituted municipal policy.

202. Upon information and belief, Sheriff Bilal and the Sheriff's Office have approved and ratified the conduct of the deputies involved, and its basis, by declining to investigate, discipline, or correct it despite its wide publicity.

**Causation**

203. The policies, customs, practices, failures to train and supervise, and policymaker decisions described herein were the moving force behind the violations of Plaintiff's constitutional rights, and directly and proximately caused the injuries and damages described herein.

204. Plaintiff presently lacks access to the Sheriff's Office's directives, training materials, supervisory communications, disciplinary records, and records of prior similar incidents, which are principally within Defendants' possession and control and will be the subject of discovery.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants City of Philadelphia, Philadelphia Sheriff's Office, and Sheriff Rochelle Bilal, in her official capacity, on Count VI; compensatory damages; nominal damages; reasonable attorneys' fees

and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other relief as the Court deems just and appropriate.

**COUNT VII**
**<u>Pennsylvania Law – False Arrest and False Imprisonment</u>**
**(Plaintiff v. Defendants Deputy Does 1 and 2 and John Does 3–10)**

205. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

206. Under Pennsylvania law, a defendant is liable for false arrest and false imprisonment where the defendant intentionally detains or restrains another person and the detention is unlawful.

207. The Doe Defendants intentionally arrested, restrained, and confined Plaintiff, and intentionally caused his continued confinement at the CJC and at Police Headquarters, from approximately 11:30 a.m. until approximately 3:00 p.m. on September 17, 2026.

208. Plaintiff was conscious of his confinement and did not consent to it.

209. The arrest and confinement were unlawful because they were not supported by a warrant or probable cause and, in the

alternative, because they continued after any basis for detaining Plaintiff had been dispelled.

210. The Doe Defendants knew that their conduct was unlawful, as reflected in their statements that Plaintiff did not appear to have done anything wrong, and acted intentionally and with willful misconduct within the meaning of 42 Pa.C.S. § 8550. They are therefore not entitled to immunity under the Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8541 *et seq.*

211. As a direct and proximate result of the Doe Defendants' conduct, Plaintiff suffered the injuries and damages described herein.

WHEREFORE, Plaintiff requests judgment in his favor and against Defendants Deputy Does 1 and 2 and John Does 3–10 on Count VII; compensatory damages; punitive damages; prejudgment and post-judgment interest; costs; and such other relief as the Court deems just and appropriate.

## COUNT VIII
## Pennsylvania Law – Assault and Battery
## (Plaintiff v. Defendants Deputy Does 1 and 2 and John Does 3–10)

212. Plaintiff incorporates by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

213. Under Pennsylvania law, an assault is an act intended to put another person in reasonable apprehension of an immediate harmful or offensive contact, and a battery is an intentional harmful or offensive contact with the person of another. A law-enforcement officer's use of force in effecting an arrest is privileged only if the arrest is lawful.

214. Deputy Does 1 and 2, and those of John Does 3–10 who physically restrained, handled, or escorted Plaintiff, intentionally made harmful and offensive contact with Plaintiff, and placed him in reasonable apprehension of such contact, by seizing him, handcuffing him, and physically escorting and placing him in vehicles and cells.

215. Because Plaintiff's arrest and detention were unlawful, the Doe Defendants' physical contact with Plaintiff was not privileged.

216. The Doe Defendants acted intentionally and with willful misconduct within the meaning of 42 Pa.C.S. § 8550 and are not entitled to immunity under the Political Subdivision Tort Claims Act.

217. As a direct and proximate result of the Doe Defendants' conduct, Plaintiff suffered the injuries and damages described herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants Deputy Does 1 and 2 and John Does 3–10 on Count VIII; compensatory damages; punitive damages; prejudgment and post-judgment interest; costs; and such other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

**KLEINBARD LLC**

Dated: November 25, 2026

**By:** /s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Francis G. Notarianni (No. 327461)
Jonathan P. Rava (No. 332615)
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Phone: 215-568-2000
Eml: mhaverstick@kleinbard.com
fnotarianni@kleinbard.com
jrava@kleinbard.com

*Attorneys for Plaintiff Jawad Pullin*